William HAWTHORNE (No. 82–549) and
Percy Jeter (No. 82–1675), Appellants,

v.

UNITED STATES, Appellee.

Nos. 82–549, 82–1675.

District of Columbia Court of Appeals.

Argued Dec. 7, 1983.
Decided April 19, 1984.

Claire O. Ducker, Sr., Washington, D.C., appointed by this court for appellant Hawthorne. Mark S. Carlin, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Public Defender Service, Washington, D.C., at the time the brief was filed, was on the brief, for appellant Jeter.

Colleen M. Kennedy, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Judith Hetherton and Barry M. Tapp, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEBEKER, MACK, and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellants raise two issues in this appeal from their convictions by a jury of felony murder while armed during the commission of a burglary in the first degree (D.C.Code §§ 22–2401, –3201 (1981)) and first degree

burglary (D.C.Code § 22–1801(a) (1981)). They contend their convictions of burglary, and the associated felony murder counts, cannot stand because the government failed to produce sufficient evidence that they entered the premises with the intent to steal. They also argue that the prosecutor's closing argument substantially prejudiced them and infected the verdict. After reviewing the record, we conclude there was sufficient evidence for the jury to convict appellants of first degree burglary and the associated felony murder counts, but reverse because the prosecutor's closing argument in the persona of the decedent was improper, as the government concedes, and substantially prejudiced appellants.[1]

### I.

Antonio Alameda, age 51, was murdered in his apartment in Northwest Washington, D.C. between the evening of June 12 and the morning of June 13, 1980. He had been stabbed fifteen times, his throat had been cut, and a plastic camera cover had been tied over his head.[2] There were bruises on the ring finger of his left hand and his pants pockets were turned inside out; his empty wallet was found in a waste basket. His apartment had been ransacked and property was missing, including a new television set, new stereo, camera equipment, and jewelry (cuff links, tie clips, St. Christopher medals, and a ring with a stone and engraving). His car keys and his car, which was usually parked next to the apartment building, were missing.

The evidence, viewed in the light most favorable to the government,[3] established that Mr. Alameda had befriended young boys over the years, some of whom had lived with him, including appellant William Hawthorne. Around the time William had lived there, Mr. Alameda had purchased a television set, a sofa and stereophonic equipment. Mr. Alameda also had a small darkroom and camera equipment in his apartment. Appellant's brother, Michael Hawthorne, had lived with Mr. Alameda for several years before William had moved in, and had seen William at Mr. Alameda's apartment in April, 1980 listening with Mr. Alameda to his new stereo.[4]

The appellants were cousins and boyhood friends who had grown up together and were together regularly, according to Jeter's aunt, Layonne Towles. She also testified that around the time of Mr. Alameda's murder,[5] both appellants had come late one night to her home on Ontario Road, Northwest, where Jeter lived, and she had seen fresh blood on Hawthorne's hands and shoes. Charlotte Hill Lacy, in whose home on Park Road, Northwest, Hawthorne and his mother lived, testified she saw blood on his clothes around the same time, early one morning. Several days after the murder, Jeter's cousin, Sandra Grigsby, saw the appellants in her home in Northeast, while they were looking at camera equipment

---

1. Appellant Jeter also contends he was prejudiced by the admission into evidence of an ineffectively redacted confession of his co-defendant who did not testify. He relies on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This court en banc has approved the use of a properly redacted admission of a nontestifying codefendant. *Carpenter v. United States*, 430 A.2d 496 (D.C.1981) (en banc). Because of our decision that reversal of the convictions is required on other grounds, however, we need not reach this issue, as appellant Jeter and the government conceded during oral argument.

2. The medical examiner testified that the cause of death was multiple stab wounds to the neck and upper back associated with asphyxiation caused by the plastic bag. He opined that two

people with two knives had stabbed Mr. Alameda, but admitted on cross-examination that he could not be sure how many people had done the stabbings.

3. *Massey v. United States*, 320 A.2d 296, 298 (D.C.1974).

4. There was also evidence that appellant William Hawthorne disapproved of Michael's relationship with Mr. Alameda, and was upset that Michael was "messing" sexually with Mr. Alameda.

5. The government's witnesses were unable to remember precise dates. They testified that these events occurred in the middle of June, when Mr. Alameda was killed.

and jewelry, including a ring and St. Christopher medal which Michael Hawthorne identified as belonging to Mr. Alameda. Edith Grigsby, Jeter's aunt and Sandra's mother, substantially corroborated Sandra's testimony and also testified that Hawthorne had told her he had recently disposed of a television set and stereophonic equipment that he had taken from someone else's home. Later he told her that someone had killed Mr. Alameda, tying a plastic bag over his head, and had laughed when she said he must have been involved since he seemed to know so much about it. Barbara Graves also testified that during the summer of 1980 Hawthorne told her that he and another person[6] had gone to Mr. Alameda's apartment, and that he had hit Mr. Alameda and the other person had stabbed Mr. Alameda, and afterwards they had taken Mr. Alameda's property from the apartment. Barbara's mother, Ann Graves, testified that Hawthorne had told her the same thing in November 1981.

Other testimony established that there was no sign of forced entry to Mr. Alameda's apartment, thereby indicating that Mr. Alameda, who was very cautious about letting people into his apartment, knew his killers. Jeter's fingerprint was found in dust on the windowsill inside Mr. Alameda's apartment.[7] Mr. Alameda's car was found a block from Jeter's home on Ontario Road, Northwest, and James Richardson

had bought Mr. Alameda's ring from Jeter a few days after the murder.

Appellant Hawthorne did not present any evidence in his defense. Appellant Jeter's defense was that he was not in the neighborhood when Mr. Alameda was killed and had left his fingerprint in the apartment in March, when he had helped a friend move Mr. Alameda's old sofa out of the apartment.[8]

## II.

The appropriate standard in reviewing a challenge to the sufficiency of the evidence is "whether there was sufficient evidence from which a reasonable juror could fairly conclude guilt beyond a reasonable doubt." *Head v. United States*, 451 A.2d 615, 622 (D.C.1982).[9] In applying this standard, we do not distinguish between direct and circumstantial evidence. *Jackson v. United States*, 395 A.2d 99, 102 (D.C.1978); *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C.1978). The motion for judgment of acquittal is viewed in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact. *Hall v. United States*, 454 A.2d 314, 317 (D.C. 1982); *Curley v. United States*, 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232, *cert.*

6. Outside the presence of the jury, it was determined that Hawthorne had identified the other person as Jeter. Ms. Graves' statement had been redacted to eliminate Hawthorne's references to Jeter and to a fingerprint on the windowsill.

7. In its case-in-chief the government presented evidence of Mr. Alameda's penchant for cleanliness in an attempt to establish that Jeter's fingerprint was very recently left in the apartment. The windowsill on which the print was found had a slight layer of dust, indicating the sill had been recently dusted. Cross-examination established that it was impossible to know the age of a fingerprint.

8. The friend, Walter Lacy, testified that Mr. Alameda had given him the sofa and he and Jeter had moved it in March 1980. But Mr.

Gunther, who drove the van which was used to move the sofa, testified they had moved the sofa only two or three days before he heard of Mr. Alameda's death. Mr. Gunther did not identify Jeter in court as the person who helped to move the sofa.

9. Appellants moved for judgment of acquittal at the close of the government's case and again at the close of all the evidence. They were originally charged with felony murder and grand larceny, felony murder and robbery, and felony murder and burglary. At the close of the government's case the trial court granted judgment of acquittal on the grand larceny and associated felony murder charges since the government had not produced evidence of the value of the stolen items. The jury acquitted both appellants of the robbery counts and the accompanying counts of felony murder.

*denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).[10]

■ The crime of burglary requires an entry, with or without a breaking, and a contemporaneous intent to commit a criminal offense. *Massey, supra* note 3, 320 A.2d at 296; *United States v. Cooper,* 153 U.S.App.D.C. 384, 386, 473 F.2d 95, 97 (1972); *United States v. Fox,* 140 U.S.App. D.C. 129, 130–31, 433 F.2d 1235, 1236–37 (1970). Appellants concede the government introduced sufficient evidence of an entry, but contend that the government failed to introduce sufficient evidence the appellants intended to steal (the offense charged in the indictments) when they entered the apartment. They argue that possession of stolen property cannot give rise to the inference that a burglary was committed. While that is partly correct, it does not help appellants here.

■ Unexplained or unsatisfactorily explained possession of stolen property cannot, by itself, give rise to the inference that a burglary was committed; by itself such evidence only gives rise to the inference that the possessor stole the property or received stolen property. *White v. United States,* 300 A.2d 716, 718 (D.C. 1973). There must also be some evidence of an entry or other evidence calculated to place the accused in the premises in which the theft occurred before the possession of stolen property can give rise to the inference that the possessor of the stolen property entered with an intent to steal the property. *Id.* at 720. Here there was circumstantial evidence of an entry into Mr. Alameda's apartment. The evidence indisputably established that Mr. Alameda was murdered in his apartment, which was ransacked, and many items of property were taken. Such evidence combined with the evidence of possession of stolen property is sufficient to establish the requisite intent. *Massey, supra* note 3, 320 A.2d at 299 (in absence of admission, intent must be proved by circumstantial evidence).

The case against appellants is strikingly similar to *Byrd, supra,* 388 A.2d 1225. In *Byrd* the defendant was acquainted with his victim and knew she had a large collection of coins and jewelry. In addition, he had accompanied her to the bank on the morning of her murder when she had withdrawn a large sum of money. After the murder the defendant was found to possess many items which had been stolen from the victim, including the coins and jewelry; he had given a ring belonging to the victim to his girlfriend the day after the murder. This court held that although the evidence was circumstantial, it was sufficient to permit the jury reasonably to infer that the defendant had entered the victim's apartment with the intent to steal the property which was later recovered from him. *Byrd, supra,* 388 A.2d at 1230.

■ The evidence against appellant Hawthorne established that he was well acquainted with Mr. Alameda, knew he owned valuable property, and was in possession of Mr. Alameda's property after he had been murdered. His admission that he was in Mr. Alameda's apartment and took his property on the night he was murdered could properly be considered by the jury as corroborating evidence. Thus, a reasonable inference arises that Hawthorne entered the apartment intending to steal valuable property that he was later found to possess. *Byrd, supra,* 388 A.2d at 1230.

10. A defendant who introduces evidence after denial of the motion thereby waives that motion; consequently it is the denial of the motion made at the close of all the evidence that is the proper subject of our scrutiny, and in determining the propriety of the trial court's denial of the motion at the close of all the evidence we may consider its sufficiency in the light of all the evidence introduced. *Franey v. United States,* 382 A.2d 1019, 1021–22 (D.C.1978). Appellant Hawthorne did not introduce any evidence and as to him we review only the government's evidence. Since appellant Jeter introduced evidence in his defense after the denial of his motion at the close of the government's case, he assumes the risk that his evidence will bolster the government's case to support a conviction. *Clark v. United States,* 418 A.2d 1059, 1060 n. 2 (D.C.1980).

While appellant Jeter was less well-acquainted with Mr. Alameda, he was well-acquainted with appellant Hawthorne and was with him on the night when Hawthorne's clothes were stained with fresh blood. Jeter's own evidence, in addition to the government's fingerprint evidence, also tended to prove he was in the apartment after Mr. Alameda had acquired the property which was stolen. Accordingly, the jury could reasonably conclude that he too knew before the entry and murder that Mr. Alameda owned valuable property. Further, Jeter had sold the ring which was violently removed from Mr. Alameda's finger, and let his cousin, appellant Hawthorne, hide the stolen property at Jeter's aunt's house in another part of the District of Columbia, away from the area where the murder occurred. Jeter's contention that the government failed to negate the most reasonable explanation of the fingerprint evidence which is consistent with innocence and to show that the fingerprint was made during the commission of the crime, *In re M.M.J.*, 341 A.2d 421, 422 (D.C.1975), is without merit; the government was not required to meet such a heavy burden since it did not rely solely on the fingerprint evidence to show that an entry and theft had occurred. *Compare Hawkins v. United States*, 329 A.2d 781, 782 (D.C.1974) (where only evidence to identify appellant as masked robber was fingerprint, fact that fingerprint was on bedroom dresser in area generally inaccessible to general public or appellant made evidence sufficient to negate any reasonable possibility print left at time other than robbery).

Accordingly, we hold there was sufficient evidence of burglary in the first degree upon which a jury could find the appellants guilty. *Byrd, supra,* 388 A.2d at 1230–31. The underlying felony permits the jury to infer the state of mind which is required for conviction of first-degree murder, and the evidence was sufficient for a jury to find beyond a reasonable doubt that

appellants inflicted an injury on the decedent from which he died, and that the injury was inflicted in perpetration of a specified felony. *Waller v. United States*, 389 A.2d 801, 807 (D.C.1978).

### III.

■ Appellants also urge reversal of their convictions on the ground that the prosecutor's closing argument was improper and substantially prejudiced the outcome of their trial. The government has conceded the impropriety of the closing argument but asserts the proper standard of review is plain error which appellants have failed to demonstrate.

The government contends that appellants' failure to object until the initial closing argument was over, despite the trial court's admonitions to counsel to object promptly to alleged errors, constitutes a waiver of review except for plain error. *Watts v. United States*, 362 A.2d 706, 708–09 (D.C.1976) (en banc) (errors not raised at trial unreviewable on appeal except for plain error). The record reflects that prior to the commencement of closing arguments, the trial court did urge appellants' trial counsel to make timely objections. However, they maintained that their lack of objection during the prosecutor's initial argument was a tactical decision.[11] In our view their inaction here is distinguishable from sowing error in the record. *(Linwood) Johnson v. United States*, 387 A.2d 1084, 1086 (D.C.1978) (en banc); *Harris v. United States*, 131 U.S.App.D.C. 105, 106 & n. 1, 402 F.2d 656, 657 & n. 1 (1968); *Ward v. United States*, 481 F.2d 185, 187 (5th Cir.1973). Had trial counsel objected during the early part of the prosecutor's initial argument, it might have been possible for the trial court to have taken the necessary corrective action; of course, the trial court could have acted *sua sponte* as well. *Harris, supra,* 131 U.S.App.D.C. at

---

**11.** Trial counsel for both appellants made oral motions for mistrial immediately following the completion of the prosecutor's initial closing argument, before any other closing arguments commenced.

106, 402 F.2d at 657 (trial "judge's interruption does not involve the risk that counsel takes when he objects in the midst of a closing argument").[12] Nonetheless, in view of this court's decision in *Powell v. United States*, 455 A.2d 405, 408 n. 1 (D.C.1982) (denial of motion for mistrial made after rebuttal closing argument reviewed for substantial prejudice), we do not find persuasive the two cases relied on by the government in support of its position that the proper standard of review is plain error: *Ward, supra,* 481 F.2d 185 (holding the objection came too late when it was not raised until after all counsels' arguments were completed) and *United States v. Polytarides*, 584 F.2d 1350, 1354 (4th Cir.1978) (holding the objection untimely where defense failed to request a curative instruction after prosecutor's rebuttal argument and only moved for mistrial). Accordingly, we hold that appellants' motions for mistrial at the end of the prosecutor's initial closing argument preserved the error for review on a standard less stringent than plain error. Therefore, the standard of review here is whether the prosecutor's argument caused substantial prejudice to appellants.

■■■■■ This court has held that once prosecutorial misconduct has been found, the conviction will be reversed if the error rises to the level of substantial prejudice. *Dent v. United States,* 404 A.2d 165, 172 (D.C.1979). To determine whether substantial prejudice has resulted from misconduct, the test is "whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Powell, supra,* 455 A.2d at 411 (quoting *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) and *Kotteakos v. United States,* 328

U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). The decisive factors are the gravity of the misconduct, its direct relationship to the issue of innocence or guilt, the effect of corrective instructions, if any, and the weight of the evidence of appellant's guilt. *Fornah v. United States,* 460 A.2d 556, 560 (D.C.1983); *Villacres v. United States,* 357 A.2d 423, 428 (D.C. 1976); *Powell, supra,* 415 A.2d at 411.

The prosecutor delivered most of his closing argument in the first-person voice of the deceased, Mr. Alameda. In the first sentence of his initial closing argument, the prosecutor announced to the jury that "I on behalf of Mr. Alameda have an opportunity to speak to you." Then, after explaining the nature of the circumstantial evidence, the prosecutor returned to the theme of speaking for Mr. Alameda. The argument rambled through aspects of Mr. Alameda's life, including his good works for the community's young people, his planned trip to visit his parents, his hopes to live to be 60 years old and to die from natural causes, and suggestions that he was a homosexual. In focusing on the murder, the prosecutor, still speaking as Mr. Alameda, described how he answered the door and let appellants into his apartment, how he felt when he was being stabbed, how he had not screamed because he could not believe it was happening to him, and how his throat was cut "as people often do in sacrifices." The prosecutor told the jury, still as Mr. Alameda, that he was not angry at William Hawthorne but thought "it wasn't fair. I shouldn't have died that way." The argument graphically portrayed the brutality of the killing [13] and highlighted Mr. Alameda's kindliness. The prosecutor told the jury that Mr. Alameda's eyes were open while he was being stabbed and that he had asked appellants why they were doing this

12. In *Harris, supra,* 131 U.S.App.D.C. at 108, 402 F.2d at 659, then Circuit Judge Burger noted that trial judges "may well need to take steps to make the 'ground rules' known ... and to deal promptly and firmly with deviations from proper conduct."

13. The record indicates that during his argument the prosecutor put photographic exhibits of Mr. Alameda's body and apartment on the jury box and threw others (including Mr. Alameda's shirt with blood stains) on the floor.

to him, since he would have given them the things they had taken if they had asked. The prosecutor continually told the jury about what Mr. Alameda knew after he had died,[14] and repeated that Mr. Alameda could not comprehend that William Hawthorne would do this to him since Mr. Alameda had taken him into his home.

Appellant Hawthorne claims the prosecutor's closing argument is "a text-book illustration of what constitutes unfair, prejudicial tactics which were purposely designed wrongfully to appeal to the emotions and sympathy of the jury ..." contrary to the guidelines set for prosecutors by the Supreme Court in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).[15] Appellant Jeter joins in those claims, relying also on this court's decision in *Powell, supra,* 455 A.2d at 410, in contending that the prosecutor's comments "were improper and exemplify the type of misconduct this court consistently condemns."[16] In conceding that the prosecutor's argument in the persona of the decedent was improper, the government denies that the prosecutor misstated the evidence and urges that the jury "can be credited with enough common sense to recognize the prosecutor's manner of delivery as a rhetorical device, and only that."

It is beyond peradventure to suggest that the prosecutor was confused about his responsibilities in this case. As set forth in *Berger, supra,* 295 U.S. at 88, 55 S.Ct. at 633, the Supreme Court has stated

> The United States Attorney is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern

at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

The question before us is whether the ill-founded rhetorical device, which the government commendably admits "has no place in a criminal trial," was so pervasive and inflammatory that "when viewed in totality, ... the cumulative effect of prosecutorial misconduct substantially interfered with the jury's ability to evaluate the evidence...." *Powell, supra,* 455 A.2d at 411. In our view, the rhetorical device was ill-founded because it placed the prosecutor in the shoes of the victim and expressed the prosecutor's personal opinion about Mr. Alameda's thoughts, before and after his death, which were not, and as to the latter obviously could not be, evidence in the case. *(Philip) Dyson v. United States,* 418 A.2d 127, 130 (D.C.1980) (this court has admonished lawyers "to eschew personal opinions in the course of arguments to juries because this can divert jurors from their role"); *Harris, supra,* 131 U.S.App. D.C. at 107, 402 F.2d at 658. The argument not only included nonevidence but irrelevancies designed to inflame the emotions of the jury.[17] Nearly one-half of the

---

14. For example, the prosecutor, as Mr. Alameda, said "because William is very talkative and I knew he was going to tell his aunt that he had got somebody's television and somebody's receiver and sold it because they were big items." Later he told the jury that it never crossed appellants' minds that Sandra Grigsby would pay any attention to what was going on.

15. The quotations in this paragraph are from the briefs filed by the parties in this court.

16. Appellant Jeter also contends the prosecutor misstated testimony and used appellant Hawthorne's admission against him, although the admission was only in evidence against Hawthorne. In view of our ruling, we do not examine these claims of error.

17. For example, we find no other purpose reasonably evident in the prosecutor's seance-like recounting of how Mr. Alameda felt about his murderers after he had died. *See Viereck v.*

prosecutor's initial closing argument was delivered in the first person voice of Mr. Alameda and essentially all of the argument was seen through Mr. Alameda's eyes and mind.

▬▬▬ The first person singular rhetorical device had the dual effect of placing the prosecutor in the victim's shoes and turning the prosecutor into Mr. Alameda's personal representative. A prosecutor may no more represent the victim in this fashion than he may urge the jurors to place themselves in the victim's shoes. *Clarke v. United States,* 256 A.2d 782, 786–87 (D.C. 1969); *Turner v. United States,* 443 A.2d 542, 554 (D.C.1982); *Villacres, supra,* 357 A.2d at 426 n. 3; *see also Sellars v. United States,* 401 A.2d 974, 977–78 (D.C.1979). The prosecutor is also forbidden from appealing to the jury's emotions and sympathy for the victim of a crime. *Powell, supra,* 357 A.2d at 410 ("we have and continue to condemn such emotional appeals"), and cases cited therein. Moreover, a prosecutor's inflammatory appeal to a jury may constitute misconduct central to the ultimate issue of guilt or innocence. *(Duane) Dyson v. United States,* 450 A.2d 432, 438 (D.C.1982); *Reed v. United States,* 403 A.2d 725, 730 (D.C.1979). This is especially true when, as here, the misconduct is pervasive and the evidence of guilt sufficient to convict, but not overwhelming. The evidence of burglary was totally circumstantial; most of the government's witnesses could not remember precise dates crucial to the case against appellants, and appellant Jeter offered an innocent explanation for the existence of his fingerprint in Mr. Alameda's apartment. As an eyewitness to the murder and the burglary, the prosecutor, in the person of Mr. Alameda, lent additional credibility to the government's witnesses while appealing to the jury's emotions and prejudices. Thus, we cannot say that the prosecutor's extraordi-

nary argument did not substantially prejudice and affect the ultimate issue of guilt or innocence of appellants.

Finally, we cannot say with fair assurance that the trial court's instructions to the jury adequately protected appellants. The trial court did not caution the prosecutor during his initial closing argument to the jury.[18] *Parks v. United States,* 451 A.2d 591, 613 (D.C.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). A purported corrective instruction was not given until three more closing arguments had been completed. Then, as a part of the general charge to the jury, the trial court instructed:

> The statements and arguments of counsel are not evidence. They are only intended to assist you in understanding the evidence and the positions of the parties.

In our view, this was insufficient to eradicate the harm done. Indeed it can be read to have exacerbated the error for the argument cannot fairly be characterized as "intended to assist ... in understanding the evidence." The prosecutor's in persona argument required more than a delayed, minimal corrective instruction to assure that the jury was not improperly swayed in its judgment. See *Powell, supra,* 455 A.2d at 411, reversing after the trial court had given the same general instruction as was given in the instant case, and stating that "[c]urative judicial instructions ... do not always eradicate the harm."

Under these circumstances, we find "prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence." *Berger, supra,* 295 U.S. at 89, 55 S.Ct. at 633. In *(Duane) Dyson, supra,* 450 A.2d at 443, this court noted

> [C]ase law in this jurisdiction has put counsel on notice that certain types of arguments are impermissible and that counsel who practice here, including

---

*United States,* 318 U.S. 236, 247–48, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1943); *Lloyd v. United States,* 333 A.2d 387, 392 (D.C.1975) and cases cited therein.

**18.** After denying defense counsels' motions for mistrial, the trial court admonished the prosecutor, during a bench conference, to refrain from such tactics in his rebuttal argument.

prosecutors, are expected to abide by those decisions. The failure by prosecutors to do so will result in the reversal of convictions whenever it is shown that prosecutorial excesses have created substantial prejudice and thus infected the verdict.

We hold appellants were substantially prejudiced by the prosecutor's use of the first-person rhetorical device which transformed him into the victim begging for the jury's sympathy. Accordingly we reverse appellants' convictions and remand for a new trial.

*Reversed and remanded.*