Howard JONES, Appellant,

v.

UNITED STATES, Appellee.

David W. TINSLEY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–1493, 84–1804.

District of Columbia Court of Appeals.

Argued Dec. 4, 1985.

Decided June 12, 1986.

Andra Barmash Greene, Washington, D.C., appointed by this court, for appellant Jones. Stephen G. Milliken, Washington, D.C., also appointed by this court, was on brief, for appellant Jones.

Thomas K. Clancy, Washington, D.C., appointed by this court, submitted on brief, for appellant Tinsley.

Daniel S. Seikaly, Asst. U.S. Atty., with whom Joseph E. di Genova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee.

Before BELSON, TERRY and ROGERS, Associate Judges.

TERRY, Associate Judge:

Following a jury trial, appellants Tinsley and Jones were each convicted of robbery.[1] Tinsley was also convicted of assault on a police officer.[2] Jones filed a motion for new trial, which the court denied after a hearing. Both appellants present to us several grounds for reversal. We find Jones' arguments unpersuasive and therefore affirm his conviction. We also affirm Tinsley's conviction of assault on a police officer, but we reverse his conviction of robbery.

## I

One evening in October 1983, members of the Metropolitan Police Street Crime Unit conducted a decoy operation in the 800 block of 11th Street, N.W., near the Greyhound Bus Terminal, an area where there had recently been a number of robberies. Officer William Manning, working under cover, was assigned to work as the decoy. Posing as a "youthful tourist type," Manning was dressed in casual clothes and carrying a suitcase, a canvas duffel bag, and a combination radio and tape cassette player. He sat down on his duffel bag, leaned against a wall which separated the bus parking area from the street, and closed his eyes, pretending to fall asleep. All this time Sergeant Christopher Scrapper and Officer Louis Cannon were watching him from the roof of the District of Columbia Convention Center across the street, approximately 200 feet away. Sergeant Scrapper testified that they had an unobstructed view of the area, which was well-lit by high intensity street lights; Officer Cannon also had a pair of binoculars. Two arrest teams of two officers each were also in the vicinity.

At about 9:30 p.m., Sergeant Scrapper noticed the two appellants walking north on 11th Street. As they passed the apparently sleeping Officer Manning, Tinsley

---

1. D.C.Code § 22–2901 (1981).

2. D.C.Code § 22–505(a) (1981).

pointed at him. The two men then went behind the wall into the bus area, where they remained for a few moments. When they came back out to the sidewalk, Tinsley stood about seven feet away and began looking up and down the street, while Jones shook Officer Manning for at least half a minute. At this point Manning had his left arm around the radio, with his fingers touching it. Manning testified that he was aware of being shaken but kept his eyes closed the entire time, still feigning sleep. When Manning failed to respond to the shaking, Jones reached down and picked up the radio. As he did so, Tinsley motioned toward him and then toward the bus station.[3] Jones walked past Tinsley, and then the two of them walked through the parking area and entered the bus terminal through the rear door.

Sergeant Scrapper relayed his observations by radio to the two arrest teams. One of those teams, comprised of Officers Raymond Buker and Walker Roach, approached Jones and Tinsley inside the bus terminal. When the officers were within a few feet of them, they identified themselves by shouting, "Police officers." Jones surrendered to Officer Roach without a struggle; Tinsley, however, began to fight with Officer Buker. He struck Buker in the eye and continued to beat him about the face and head until the other arrest team arrived and separated the two men, repeatedly yelling "Police" as they did so. Buker sustained a few bruises, a swollen eye, and a cut over one eyebrow which left a small scar.

Both appellants testified at trial. Tinsley said that he and Jones were walking north on 11th Street, en route to a nearby McDonald's restaurant, when they noticed Officer Manning "lying on the ground."

Tinsley kept walking but stopped when Jones told him to "hold up." As Jones bent down to shake Officer Manning, Tinsley stood and waited, approximately ten feet away. Tinsley specifically denied acting as a lookout. He also said that the radio was lying one or two feet away from Manning.[4] After Jones picked up the radio, the two of them went into the Greyhound terminal, intending to continue to McDonald's. While they were still inside, however, someone grabbed Tinsley by the throat and called him an obscene name. In order to defend himself, Tinsley hit this man, Officer Buker, in the face several times. Tinsley said he did not know Buker was a police officer until after the struggle was over. One of the other officers, Ruben Rodriguez, called as a defense witness, testified that he saw Buker's hand on Tinsley's neck while Tinsley was hitting him.[5]

Jones testified that before he took the radio, he shook Manning for about two minutes and asked him loudly whether it was his radio. Manning did not respond and appeared to be "out ... dead, like a bum, derelict." Jones also said that the radio was about three feet away from Manning when he took it. On cross-examination Jones stated that when he stopped and began to shake Manning, Tinsley kept walking. Jones denied talking with Tinsley about the radio and denied that Tinsley was going to help him take it. He said that he thought the radio was abandoned, and that he tried to arouse the sleeping Manning because he "thought there might be a possibility" that the radio was his, and he "didn't want to steal nothing." Jones was impeached with two prior convictions.

## II

Appellant Tinsley contends that he was denied a fair trial because the prosecutor

---

**3.** Manning did not testify (nor was he asked) whether he heard either Tinsley or Jones say anything, and Scrapper and Cannon were too far away to hear anything that either appellant might have said.

**4.** Both Sergeant Scrapper and Officer Manning had specifically testified, to the contrary, that

Manning had his arm around the radio and that his fingers were touching it. Manning said that when he was trained to be a decoy, he was instructed to hold the radio in this manner.

**5.** Buker denied using a choke hold on Tinsley.

engaged in misconduct in her closing argument by arguing facts not in evidence, and that both of his convictions should therefore be reversed. We agree, but only in part.

During her closing argument, the prosecutor [6] made the following comments about the government's case against Tinsley:

And then Mr. Jones moves in and picks up and snatches that radio that is under Officer Manning. Officer Cannon also told you what Mr. Tinsley did. Officer Cannon focusing with his binoculars on Mr. Tinsley's hands. Sergeant Scrapper told you why he focuses on his hands. He sees Mr. Tinsley gesturing, come on, come on, *telling him to pick up the radio; that it is safe, that the coast is clear.*

Then, in rebuttal, the prosecutor said:

[Tinsley] was helping Mr. Jones, *telling him when the coast was clear.*

Their own witness, Officer Cannon, who they put on the stand, did [Tinsley's attorney] once mention to you about what Officer Cannon told you; that he was looking through the binoculars, looking at Mr. Tinsley's hands *and he is going, "Come on, come on and take it," just gesturing.*

You see he never mentioned that because that is behavior that ties Mr. Tinsley to this offense. He was acting as a lookout. *He was telling him when the coast was clear.* [Emphasis added.]

During rebuttal, the prosecutor also argued that "Tinsley thought he would get away with lying" when he testified that he had received a large bump on his forehead during the struggle with Officer Buker.

After the arguments had ended, the court rebuked the prosecutor at a bench conference for her remarks about what Tinsley had supposedly said because there was no evidence that anybody heard Tinsley say anything. The prosecutor conceded that there was no such evidence, but asserted that the jury could reasonably draw

such an inference "from the facts as they are presented." Tinsley's counsel did not request either a corrective instruction or a mistrial, so the court took no further action.

■ We must first determine whether the prosecutor's actions amount to misconduct. This court has repeatedly condemned assertions by counsel that a witness has lied on the witness stand. *E.g., Psychiatric Institute v. Allen,* 509 A.2d 619, 628–29 (D.C.1986); *Miller v. United States,* 444 A.2d 13, 15–16 (D.C.1982); *(Phillip) Dyson v. United States,* 418 A.2d 127, 130–132 (D.C.1980); *accord, Harris v. United States,* 131 U.S.App.D.C. 105, 402 F.2d 656 (1968). "It is for the jury to decide whether a witness is truthful and an attorney may not inject personal evaluations and opinions as to a witness' veracity." *Dyson, supra,* 418 A.2d at 130; *see McCowan v. United States,* 458 A.2d 1191, 1198 (D.C.1983). Accordingly, we hold that the prosecutor's comment that "Tinsley thought he would get away with lying" was improper.

■ The prosecutor did not engage in misconduct when she argued the inference that Tinsley was telling Jones the coast was clear from the fact that Tinsley was gesturing toward Jones. "A prosecutor is entitled to make reasonable comments on the evidence," *Tuckson v. United States,* 364 A.2d 138, 142 (D.C.1976), and "to argue all reasonable inferences from the evidence adduced at trial." *Streater v. United States,* 478 A.2d 1055, 1058–1059 (D.C. 1984). The inference that the gesture meant the coast was clear was a reasonable one from the evidence adduced at trial.

■ The prosecutor crossed into forbidden territory, however, when she said that Tinsley was "telling [Jones] to pick up the radio" and that Officer Cannon was "looking at Mr. Tinsley's hands and he is going, 'Come on, come on and take it,' just gesturing." There was not a scintilla of evidence to indicate what, if anything, Tinsley may

---

6. The government is represented by different counsel on appeal.

have said while he was gesturing. This comment, in our view, cannot be regarded as "a reasonable [inference] from the evidence adduced at trial." *Id.* We do not accept the government's suggestion that the comment was proper because the prosecutor was merely verbalizing a gesture. She did not simply ask the jury to infer what Tinsley meant by his gestures, but actually asserted that Tinsley said, "Come on, come on and take it," as the trial judge recognized in his remarks at the bench.

■■■ Once we have concluded that misconduct occurred, we must then decide whether it resulted in substantial prejudice. Since Tinsley's counsel failed to object at trial to either of the remarks which he now challenges,[7] we will reverse Tinsley's conviction only if we find plain error, *i.e.,* error "so clearly prejudicial to [his] substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc); *accord, e.g., Sherrod v. United States,* 478 A.2d 644, 655 (D.C.1984). To determine whether the misconduct infected the jury's verdict, "viewing the comments in context, we must consider the gravity of the misconduct, [its] direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case." *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985) (citations omitted).

On this record we hold that there was plain error, which was not cured by the trial court's instruction that the arguments of counsel were not evidence. In asserting that Tinsley told Jones to take the radio, the prosecutor was arguing a fact not in evidence, as she herself admitted to the trial court. The relationship of the comment to the issue of guilt or innocence was direct and close. On the facts of this case, Tinsley could be found guilty only if he aided and abetted Jones when Jones took the radio. Her comment significantly strengthened the inference that Tinsley was an aider and abettor. While legally

sufficient to support a conviction, the evidence of Tinsley's participation in the robbery was not very strong. Tinsley was walking down the street with Jones. When they saw Officer Manning, apparently asleep, the two men stopped and spoke to one another. During the robbery, Tinsley stood a few feet away, looked up and down the street and gestured toward the bus station. Then, after Jones had taken the radio, both men walked into the station together. Tinsley's actions were consistent with innocence as well as with guilt. He specifically denied any knowledge of what was in Jones' mind when Jones stopped and shook Officer Manning, and he denied any interest in the radio because he knew it was not his. Because the prosecutor's comment had a direct bearing on the issue of guilt, and because the case against Tinsley on the robbery charge was so close, we conclude that the prosecutor's improper assertion of a fact not in evidence—which considerably strengthened the government's case—amounted to plain error and now requires reversal of the robbery conviction. *See Miller v. United States, supra,* 444 A.2d at 16 (conviction reversed because the prosecutor accused a witness of lying, and "[t]here was no evidence adduced at trial to support the prosecutor's contentions of perjury"); *Jones v. United States,* 119 U.S.App.D.C. 213, 214, 338 F.2d 553, 554 (1964) (conviction reversed in a "paper-thin" case because the prosecutor "sought to shore up obvious weaknesses in the Government's case" by asserting facts in her opening statement which were not later proven, and by stating facts not in evidence in her questions to a witness).

■■■ We reach a different conclusion with respect to the prosecutor's statement that Tinsley "thought he would get away with lying." As we have said, this comment was improper. It was somewhat related to the issue of guilt, in that the prosecutor made it in the context of an argument that the jury should not believe

---

7. Tinsley is represented by different counsel on appeal.

Tinsley's version of what happened. This particular comment, however, had to do primarily with the charge of assault on a police officer. Tinsley's defense to that charge was essentially that he did not know Officer Buker was in fact a police officer. While Tinsley testified that he did not hear the officers identify themselves, both Buker and Roach testified that they did so. In addition, the officers from the backup arrest team repeatedly yelled "Police" as they pulled Tinsley off Officer Buker. In light of this evidence, which was by no means weak, and in light of counsel's failure to object, we are not persuaded that the prosecutor's remark about "lying" rose to the level of plain error, *i.e.,* error which "jeopardize[d] the very fairness and integrity of the trial." *Watts v. United States, supra,* 362 A.2d at 709. Accordingly, we decline to reverse Tinsley's conviction of assault on a police officer on this ground.[8]

### III

Tinsley also contends that the trial court committed error when it allowed Sergeant Scrapper to state his opinion that Tinsley was "acting as an apparent lookout" during the robbery. Defense counsel did not object to this testimony, however, so we must find plain error in its admission before we can reverse. We agree that the admission of the statement was error, but we conclude that the error was rendered harmless almost immediately when Scrapper explained the basis for his opinion.

On direct examination Sergeant Scrapper testified:

Q. Let me ask you this. While ... Mr. Jones was in the area of the decoy, what was Mr. Tinsley ... doing?

A. Mr. Tinsley was looking up and down the street, *acting as an apparent lookout.*

Q. Now when you say looking up and down the street, acting as an apparent lookout, Sergeant Scrapper, can you tell the members of the jury and the Court what you mean by that?

A. There's a lot of pedestrian traffic in this area. He was looking up and down the street to see if anybody was coming.

[COUNSEL FOR TINSLEY]: Objection, Your Honor.

THE COURT: Sustained.

Q. Without telling us what was going through his mind, can you tell us what you observed?

A. He looked up and down the street to observe what was happening on the street on [*sic*] this time and who was in the street, if anybody [in] particular was in the street.

\* \* \* \* \* \*

Q. Let me ask you this, Sergeant Scrapper. Based on your experience in the observation post, *what made you*

---

8. Tinsley asserts that another issue relevant to this charge was whether he acted in self-defense. But the evidence offered by Tinsley did not raise any issue of self-defense. Rather, it challenged the government's proof of one of the elements of the crime: that Tinsley knew or should have known that Buker was a police officer. *See Petway v. United States,* 420 A.2d 1211, 1213 (D.C.1980). Furthermore, his trial counsel stated that he was "not arguing self-defense," and on appeal Tinsley is bound by the position his counsel took at trial. *Byrd v. United States,* 502 A.2d 451, 453 (D.C.1985).

In any event, the 1970 amendment to D.C. Code § 22–505(a) makes clear "that the use of force to resist even an unlawful arrest is not a defense to the crime of assaulting a police offi-

cer." H.R.REP. No. 91–907, 91st Cong., 2d Sess. 70 (1970); *see McDonald v. United States,* 496 A.2d 274, 276 (D.C.1985); *Brown v. United States,* 274 A.2d 683, 684 n. 4 (D.C.1971). Thus self-defense is not a valid defense to a charge of assault on a police officer unless the officer has used excessive force. *See* H.R.REP. No. 91–907, *supra* at 70. Since there was no claim of excessive force in this case, the trial court did not err in failing to give either a self-defense instruction or the sixth element of the standard instruction on assault on a police officer, "[t]hat the defendant [committed the offense] without justifiable and excusable cause." Criminal Jury Instructions for the District of Columbia, No. 4.15 (3d ed.1978).

*conclude that Mr. Tinsley was acting as a lookout?*

A. The fact that they were together when they arrived at the scene. The fact that they had discussed—apparently discussed the decoy and the radio. The fact that after the discussion ... Mr. Tinsley was looking up and down the street, obviously looking up and down the street, snapping his head back and forth. The fact that they rejoined each other and were looking at the radio as they walked into the bus terminal. [Emphasis added.]

On cross-examination Tinsley's counsel asked Sergeant Scrapper a series of questions covering essentially the same ground.

 Under modern rules of evidence, a non-expert witness [9] is permitted to express opinions "as long as those opinions are based on the witness' own observation of events and are helpful to the jury." *Fateh v. Rich*, 481 A.2d 464, 470 (D.C. 1984); *see* E. CLEARY, MCCORMICK ON EVIDENCE § 11, at 28–29 (3d ed. 1984); FED.R. EVID. 701. In this case, however, because the jury was just as capable of drawing a conclusion about Tinsley's role as Sergeant Scrapper was, his opinion testimony did not meet the requirement that it be helpful to the jury. *Cf. Lampkins v. United States*, 401 A.2d 966, 969 (D.C.1979) (even an expert witness "may not state his opinion where the jury is capable of drawing its own conclusions from the evidence").[10] Therefore, the admission of his testimony that Tinsley was "acting as an apparent lookout" was error.

 Considered in context, however, the error was manifestly harmless. The jury was not presented simply with Scrapper's conclusory statement. *Compare Heilman v. District of Columbia*, 172 A.2d

141, 142 (D.C.1961) (witness testified that defendant made "obscene and indecent remarks" but did not say what they were). Within moments after making the challenged statement, Scrapper was asked the basis for his opinion, and he gave it in detail. At that point the jury had all the facts necessary to determine for itself whether Tinsley was acting as a lookout, and Scrapper's opinion became superfluous. We therefore find no basis for reversal in Scrapper's testimony.[11]

## IV

Both appellants attack the prosecutor's conduct in other respects, contending that several of her comments at various times during the trial impermissibly appealed to the jurors' emotions. In view of our disposition of the other issues raised by Tinsley, we need not consider this aspect of his argument; accordingly, we focus only on the assertions made by Jones. Specifically, Jones objects to the prosecutor's comments that the decoy unit was "attempting to prevent crime," that the location of the robbery was a place of "continual crime," that the police officers were trying "to prevent you and I [*sic*] or other ordinary citizens ... from being victims of crime," and to her repeated use of the phrase "vulnerable victim." He further contends that the prosecutor improperly urged the jurors to place themselves in the victim's shoes and improperly commented on his prior robbery conviction.

 The majority of the challenged comments did not amount to misconduct. We see no impropriety in the prosecutor's speaking of the decoy unit as "attempting to prevent crime" or referring to Officer

---

9. Sergeant Scrapper was not presented to the court as an expert on "lookouts."

10. The cases cited by the government can be distinguished because in each of them the evidence was such that the jury would not have been capable of drawing its own conclusions from the evidence. *E.g., Bell v. District of Columbia*, 218 A.2d 520, 521–522 (D.C.1966); *Woolard v. District of Columbia*, 62 A.2d 640, 641

(D.C.1948); *United States v. Pierson*, 164 U.S. App.D.C. 82, 85–86, 503 F.2d 173, 176–177 (1974).

11. Because we conclude that the admission of Scrapper's opinion testimony was harmless error, we also reject Tinsley's claim that his counsel was ineffective for failing to object to its admission. *See Chavarria v. United States*, 505 A.2d 59, 66 (D.C.1986).

Manning as a "vulnerable victim." The case cited by both appellants, *Hawthorne v. United States*, 476 A.2d 164 (D.C.1984), involved conduct of an entirely different order from that of the prosecutor in this case.[12] Nor do we find misconduct in the prosecutor's remark, during her opening statement, that the police dress one of their own officers in plain clothes "and make him appear like one of us...." Although this comes closer to putting the jury in the shoes of the victim, which *Hawthorne* and other cases forbid, *see id.* at 172 (citing cases), we are not persuaded that these few words, read in context, had that effect.

One of the prosecutor's remarks, however, presents a closer question. In her closing argument, immediately after discussing one of the crucial factual disputes of the case—whether Officer Manning was holding the radio in his arm or whether it was sitting on the ground a few feet away from him—the prosecutor referred to Jones' prior robbery conviction. The main thrust of her argument at this point was that Jones' credibility was so weak that his version of events should not be believed.

■■■■ The government may not link argument about the defendant's similar previous convictions with argument that the defendant committed key elements of the charged offense. *See Dorman v. United States*, 491 A.2d 455, 459 & n. 2 (D.C. 1985) (en banc). To determine whether the prosecutor committed this type of misconduct, we must decide whether, under the circumstances, reasonable jurors would naturally and necessarily have regarded the manner in which the conviction was argued as implying that Jones was guilty of the crime charged because he was convicted of a similar crime in the past. *Id.* at 460 & n. 5; *see (Duane) Dyson v. United States*, 450 A.2d 432, 441 (D.C.1982). Applying this test, we conclude that the prosecutor should not have put the reference to Jones' prior conviction so close to the rhetorical question, "Who tells you that the radio was one to three feet away?" *See Dorman, supra*, 491 A.2d at 462–464.[13]

Since Jones' trial counsel did not raise any objection, however, we must determine whether the reference to the prior robbery conviction amounted to plain error. *See Watts, supra*, 362 A.2d at 709. We hold that it did not. The prosecutor's remark was made in the context of an otherwise proper argument: that the officers were more credible witnesses than Jones, a man with a prior felony conviction. The evidence against Jones was strong: three police officers testified to his involvement in the robbery. He did not contest that he did what the officers saw him do, but defended on the ground that he thought the radio was abandoned property. Finally, the trial court gave excellent instructions on both the role of argument by counsel and the proper use of a prior conviction by the jury. *See Dorman, supra*, 491 A.2d at 462, 464. *Compare Dyson, supra*, 450 A.2d at 440–443.

■■■ Moreover, the question of whether the prosecutor's reference to the prior conviction required setting aside the verdict was considered by the trial court at the hearing on Jones' motion for new trial. The court denied the motion because, in its view, the evidence against Jones was "ab-

---

12. In *Hawthorne, supra*, this court reversed a murder conviction because the prosecutor "delivered most of his closing argument in the first-person voice of the deceased," graphically portraying the brutality of the killing and purporting to describe the feelings of the victim as he was being fatally stabbed. 476 A.2d at 170. We condemned this "ill-founded rhetorical device" because it "placed the prosecutor in the shoes of the victim and expressed the prosecutor's personal opinion about [the victim's] thoughts, before and after his death, which were not, and as to the latter obviously could not be, evidence in the case." *Id.* at 171 (citations omitted).

13. At a bench conference after the closing arguments of counsel, the trial court told the prosecutor that "there could have been other places in the 35 minutes that you argued to put the reference to Mr. Jones' prior conviction...." The court opined that the prosecutor's use of the conviction "was not proper" but that the impropriety could be "corrected" by an instruction.

solutely overwhelming." When the trial court has considered such an issue on a motion for new trial, we will generally defer to its judgment in the matter, for the trial court is in the best position to assess the impact of such occurrences on the fairness of the trial. *Smith v. United States,* 315 A.2d 163, 167 (D.C.) (citations omitted), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); *see Dorman, supra,* 491 A.2d at 462. In these circumstances, we conclude that Jones' conviction should not be reversed on this ground.

## V

Jones also asserts that he was denied the effective assistance of counsel. In support of this claim, he points to his counsel's failure to object to improper testimony offered by government witnesses and to the government's assertedly prejudicial misconduct, counsel's failure to make an opening statement, and counsel's failure to present a defense of innocence.

The test for evaluating claims of ineffective assistance of counsel articulated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by this court in *White v. United States,* 484 A.2d 553, 558 (D.C.1984), has two components:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■■ Jones first asserts that his counsel was deficient because he presented no factual or legal theory of defense consistent with innocence. *See Angarano v. United States,* 312 A.2d 295, 298 n. 5 (D.C.1973), *rehearing en banc denied,* 329 A.2d 453 (1974). Contrary to Jones' assertion, a defense theory consistent with innocence was presented to the jury: that Jones did not possess the necessary intent to commit robbery because he believed the radio had been abandoned. Defense counsel asked a series of questions designed to establish Jones' good-faith belief that the radio was abandoned property. Jones himself testified that he shook Officer Manning for at least two minutes and asked loudly whether the radio belonged to him. Jones characterized Manning as looking like "a bum, derelict," suggesting that such a person was not likely to be the owner of a valuable radio. Jones also testified that the radio was approximately three feet away from Officer Manning, that he thought it had been abandoned, and that he had no intention of stealing it when he picked it up. The record simply does not support Jones' claim that counsel failed to present a defense consistent with innocence.

■■ Jones also asserts that his counsel failed to develop his "Good Samaritan" defense, *i.e.,* to establish his efforts to ascertain ownership of the seemingly abandoned radio. This defense has recently been discussed in a similar factual context in *Jefferson v. United States,* 474 A.2d 147, 149 (D.C.1984). Assuming—without deciding—that a "Good Samaritan" defense would be a valid defense as a matter of law, counsel's failure to pursue it appears to have been a tactical judgment on his part, which we will not second-guess. *Strickland v. Washington, supra,* 466 U.S. at 689–690, 104 S.Ct. at 2065–2066; *Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985); *Wesley v. United*

*States,* 449 A.2d 282, 284–285 (D.C.1982).[14] Tinsley testified at trial that, after Jones had picked up the radio, the two men were cutting through the Greyhound terminal on the way to McDonald's. Jones' suggestion that he was going to inquire about the ownership of the radio at the bus station— his "Good Samaritan" defense—would have been inconsistent with Tinsley's testimony. On this record we do not regard Jones' trial counsel as ineffective because he failed to develop this defense.

 Jones further contends that his counsel's failure to object to the introduction of inadmissible testimony by Sergeant Scrapper and supposed misconduct on the part of the prosecutor were further instances of ineffectiveness. Since the challenged testimony of Scrapper affected Tinsley, not Jones, we fail to see how Jones could possibly have been prejudiced by it. Assuming that Jones' counsel erred in failing to object to the prosecutor's improper comments, Jones has not shown, and cannot show, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington, supra,* 466 U.S. at 694, 104 S.Ct. at 2068. Simply put, counsel's errors, if any, simply do not "undermine [our] confidence in the outcome" of the trial. *Id.* We therefore reject entirely Jones' claim of ineffective assistance.

## VI

Jones' conviction of robbery is affirmed. Tinsley's conviction of assault on a police officer is affirmed, but his conviction of robbery is reversed. The case is remanded for a new trial of the robbery charge against Tinsley.

*Affirmed in part, reversed and remanded in part.*

14. For the same reason, we reject appellant's argument that his counsel was ineffective because he decided to waive his opening statement and did not argue for an entrapment instruction.