David F. BREWER, Appellant,

v.

UNITED STATES, Appellee.

No. 86–303.

District of Columbia Court of Appeals.

Argued Nov. 22, 1988.
Decided May 31, 1989.

Gary T. Brown, appointed by this court, for appellant. William T. Morrison, also appointed by this court, for appellant.

Judith Albert, Sp. Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Mary Ellen Abrecht, and William R. Martin, Asst. U.S. Attys., were on the brief, for appellee.

Before MACK, TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted of rape,[1] sodomy,[2] assault with intent to commit sodomy,[3] and simple assault.[4] He contends on appeal that the trial court erroneously prohibited him from introducing evidence which would show that the victim in this case was a prostitute, and that she engaged in acts of prostitution with other persons and at other times. Appellant also maintains that the prosecutor, in his closing argument, improperly commented on his failure to testify in his own behalf and made other prejudicial statements warranting reversal. We reject all these contentions and affirm the judgment of conviction.

I

Mary Jones (not her real name) first met appellant Brewer in the latter part of 1983. She and some of her woman friends were at a nightclub in Southwest Washington when Brewer came up and introduced himself to them as a hairdresser. Twice thereafter Jones went to Brewer's apartment to have her hair done (Brewer worked out of his apartment), and on each occasion she paid him $35.00. Jones testified that she regarded Brewer as a "friend" and that he never made any type of sexual advance toward her. "I trusted him," she said. "I didn't think that he really preferred women, anyway."

On August 11, 1984, Jones made plans to meet her friend Marion Oates at the same nightclub where she had first encountered Brewer. Jones arrived at the appointed time, shortly after 10:00 p.m., but Oates never showed up. However, Jones did see another friend, Norman Smith, and spoke with him for about fifteen minutes. She also saw Brewer there and spoke with him briefly. Jones saw Brewer again later, as she was leaving, and gave him a ride to another nightclub, the RSVP, which was just a few blocks away. As Jones parked her car in the RSVP's garage, Brewer made some scurrilous comments about Hassan Abdullah, a man whom he had introduced to Mary Jones and whom Jones regarded as a boy friend. Brewer said that Abdullah "thought he could get all the women" and that his "intelligence [was] in his penis." Jones did not join in disparaging Abdullah but instead related her concern that he had not returned a recent telephone call. At trial she characterized Brewer's discussion of Abdullah as "very negative" and jealous.

Upon entering the RSVP, Jones paid her own cover charge while Brewer gained admittance with his membership card, and once inside each paid for his or her own drinks. After a while Jones went to the dance floor while Brewer stayed at the bar. Brewer left the club about thirty minutes later, but shortly thereafter he returned, accompanied by Hassan Abdullah. Later, at about 3:00 a.m., as Jones was leaving the RSVP to go home, she saw Brewer and Abdullah standing together between the club and Brewer's nearby apartment. She called to Abdullah, wanting to ask him why he had not returned her telephone call. He responded by inviting her to come up to

---

1. D.C.Code § 22–2801 (1981). The indictment charged appellant with two counts of rape, but he was found guilty on only one count.

2. D.C.Code § 22–3502 (1981).

3. D.C.Code § 22–503 (1981).

4. Appellant was charged with assault with intent to commit rape, D.C.Code § 22–501 (1981), but the jury found him guilty of the lesser included offense of assault, D.C.Code § 22–504 (1981).

Brewer's apartment with him, and she did so.

While the three of them were in Brewer's apartment, the two men chatted together for most of the time, and Jones spoke to Abdullah for five to ten minutes. After about a half-hour Abdullah left, but Jones did not go with him because he asked her not to, and because she was curious to find out from Brewer what he and Abdullah had talked about. A few minutes later Brewer told Jones that Abdullah had gone "to be with another woman" in the building, and asked her if she liked Abdullah. She replied that she liked him very much.

Then, as Jones was preparing to leave, Brewer walked across the room and turned out the lights. Realizing that something was wrong, Jones began to get up from the couch where she was sitting, but before she could reach the door, Brewer punched her in the eye. Frightened and in pain, she began to scream and urinated on the couch. She stopped screaming, however, when Brewer began talking to her, telling her that she was a "bitch" and a "liar" and that he was going to make her pay her "dues." He then ordered her to take off her "goddam clothes" and threatened to hurt her if she refused. As she removed her clothes, Brewer brought out a mattress [5] and spread it on the floor. He then disrobed and forced his penis into Jones' vagina. When he failed to ejaculate, he started speaking to her in obscenities and told her that if she "didn't do it right . . . he was going to get the grease" and force her to have anal sex. He then ordered Jones to perform oral sodomy and forced her to comply. Then Brewer had forcible intercourse with her a second time, but still he was unable to ejaculate. After approximately ten minutes he removed his penis from Jones' vagina and ordered her again to perform oral sodomy. When she refused, Brewer choked her and pushed her head down on his penis. After a few minutes Brewer told Jones to stop and rest, put some ice in a cloth, held it to Jones' eye, and said that he loved her but that she

hated him and treated him like a dog. Then he forced her into intercourse a third time, and finally ejaculated. When Jones asked if she could leave, Brewer replied, "Bitch, get the fuck out." Jones dressed quickly, leaving her panties and bra behind, and Brewer walked her to her car. His parting words to Jones were to let him know if she called the police so that he could clean up his apartment.

Jones got home at about 5:30 a.m. and took a shower. Several hours later, shortly before noon, she telephoned Brewer to tell him she did not intend to press charges. She then called Norman Smith, the friend she had seen earlier the previous evening at the nightclub. Smith testified at trial that Jones' voice was "quivering" and that she was "crying." When Jones told him she had been raped, Smith urged her to call the police and offered to take her to the police station.

Jones followed Smith's advice and called the police. Then, after calling her mother, she went to police headquarters, where she gave a statement to Detective Patrick Shine naming Brewer as her assailant. Shine also had three photographs taken of her "black and blue, partially swollen shut" left eye, then took her to District of Columbia General Hospital. Dr. Conrad Duncan, who examined her there, testified that "[s]he was occasionally crying and upset— but not hysterical, and in control." Dr. Duncan extracted a specimen of what turned out to be semen from Jones' vagina but observed no signs of trauma to either her vagina or her neck. The doctor said, however, that the absence of trauma to Jones' vagina was normal:

> [I]t would take extreme force to produce bruises or abrasions, or some type of object, and the reason being that the vagina is an extremely elastic and accommodating organ which, again, would take extreme force or objects to cause an abrasion or bruises.

just roll out on the floor."

---

**5.** Jones referred to this item as both a "cot" and a "mattress," describing it as "this thing that you

An FBI laboratory technician examined semen stains taken from Mary Jones' dress and found in them blood group substances which were consistent with a secretor of blood type B.[6] Swabs taken from Jones' mouth disclosed no evidence of semen, but a microbiologist testified that this was consistent with non-ejaculation or with the passage of time. Further, no evidence of urine was found on Jones' dress, but again, because of the passage of time, the FBI technician was unable to state whether urine had ever been on the dress.

The defense presented no evidence.

## II

■ Brewer contends that the trial court erred in excluding evidence of Mary Jones' alleged prior acts of prostitution with persons other than himself and evidence of her alleged reputation in the community as a prostitute. He contends first that evidence of prostitution, as distinguished from mere unchastity, was probative of his own state of mind and was not unduly prejudicial to Jones. Brewer's theory at trial was set forth by defense counsel in his opening statement, when he said that Brewer did have sex with Jones but that the evidence would show that it was sex for hire. Counsel also said the evidence would show that after Brewer and Jones had consensual, albeit illicit, sex, she was dissatisfied with the price she was paid, and that Brewer struck her only when he discovered her taking money from his wallet.

Brewer's contention that this theory of consent required the court to admit evidence of the victim's alleged activities as a prostitute—either reputation testimony or proof of specific acts, or both—is completely unjustified, and contrary both to this court's precedents and to the development of the law generally. The time is long past when a defendant charged with rape could put his victim on trial. See *Meaders v. United States*, 519 A.2d 1248, 1253–1254 (D.C.1986); *McLean v. United States*, 377 A.2d 74, 77–78 (D.C.1977); Fed.R.Evid. 412. In this case, as in *Meaders*, the evidence which the defense sought to present was

properly excluded because the victim's alleged prostitution "was not an appropriate subject of inquiry in the first place." 519 A.2d at 1253.

The trial court's decision to admit or exclude evidence is subject to reversal only for abuse of discretion. *Punch v. United States*, 377 A.2d 1353, 1358 (D.C.1977), cert. denied, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978); accord, *Johnson v. United States*, 452 A.2d 959, 960–961 (D.C. 1982). Here the trial court plainly exercised its discretion on the record, and our decisions in *McLean* and *Meaders, supra*, compel the conclusion that the court did not abuse that discretion. See also *State v. Quinn*, 121 Ariz. 582, 585, 592 P.2d 778, 781 (Ariz.Ct.App.1978) (evidence that victim was a prostitute inadmissible absent a special showing of probativeness); *People v. Williams*, 416 Mich. 25, 40–46, 330 N.W.2d 823, 829–831 (1982) (evidence of victim's prostitution inadmissible absent a showing that she consented to sexual relations with this particular defendant for pay); *State v. Gardner*, 59 Ohio St.2d 14, 16–19, 391 N.E.2d 337, 340–341 (1979) (evidence of victim's activities as a prostitute inadmissible absent a showing that financial arrangements were entered into in the case on trial, rather than previously); *Haynes v. State*, 498 S.W.2d 950, 951–952 (Tex.Crim. App.1973) (evidence that victim was a prostitute, even if true, inadmissible absent a showing that she engaged in an act of prostitution with the defendant at the time of the offense); cf. *Doe v. United States*, 666 F.2d 43, 48 n. 9 (4th Cir.1981) (noting that forty-five states have enacted rape shield statutes and citing cases).

Evidence of prior unchastity—and evidence of prostitution is certainly that—is inadmissible "except in the most unusual cases where the probative value is precisely demonstrated and outweighs the prejudicial effect of the testimony." *McLean, supra*, 377 A.2d at 79 (footnote omitted); accord, *Meaders, supra*, 519 A.2d at 1253–1254. There has been no showing, either at trial or on appeal, that this case is in any re-

6. Both Brewer and Jones are type B secretors.

spect unusual, nor did the defense at trial "precisely demonstrate" the probative value of the evidence it sought to introduce, much less that its probative value would outweigh the attendant prejudice. Even if Brewer had been able to prove that Jones had a reputation in the community for being a prostitute, or that she had engaged in acts of prostitution with persons other than himself, that evidence would not have established that Jones consented to an act of sexual intercourse with him. Had Brewer offered proof that Jones consented to perform services as a prostitute *with him* on the night in question, such evidence would have been relevant to the issues of consent and Brewer's intent;[7] however, no such offer of proof was made. What the defense sought to adduce was evidence of Jones' supposed reputation as a prostitute or of other specific but unrelated acts of prostitution, which as a matter of law have at best "very slight probative value," *McLean, supra*, 377 A.2d at 79, and are likewise highly prejudicial, *Meaders, supra*, 519 A.2d at 1254.

Brewer's premise that a prostitute is more likely to consent to sex than a non-prostitute, even if true, does not support his argument. As the Texas Court of Criminal Appeals remarked in *Haynes:*

> Even if it had been shown that prosecutrix was a prostitute, this would not have proved consent, or made her any less the subject of rape by force. A prostitute does not lose the right of choice, and may consent or not consent according to her own will.

*Haynes v. State, supra*, 498 S.W.2d at 952. In short, it cannot be assumed that prostitutes will accept every opportunity that comes along to engage in sexual relations. The fact that a woman is a prostitute,

which may prove that she has had consensual sex with others, has nothing to do with whether she consented to sexual intercourse with a particular defendant. Even a prostitute can be raped.[8]

■ Brewer contends in the alternative that the government opened the door to evidence of Jones' character during its examination of Hassan Abdullah. On direct examination, apparently in response to defense counsel's opening statement, the prosecutor asked Abdullah:

Q. Mr. Abdullah, when you were first introduced to [Mary Jones] by Mr. Brewer, do you recall how he introduced you to her, how he characterized her?

A. He introduced me to her as a friend of his, and that she was available.

Q. Did Mr. Brewer ever indicate to you whether or not he had been intimate with [Mary Jones]?

A. No, he didn't.

Q. Did Mr. Brewer ever indicate to you whether or not he paid [Mary Jones] for sex?

[DEFENSE COUNSEL]: Objection.

THE COURT: He can ask that question.

THE WITNESS: Would you repeat that, please.

\* \* \* \* \* \*

Q. Did David Brewer ever tell you that he had sex with [Mary Jones] and he paid her to have sex?

A. No, he didn't.

Q. During the time or times that you were intimate with [Mary Jones], did she ever charge you?

A. No, sir.

---

7. *See Meaders, supra*, 519 at 1252 n. 5; *McLean, supra*, 377 A.2d at 78 n. 5.

8. Brewer contends that this court in *McLean, supra*, 377 A.2d at 79 n. 9, by referring to *Pope v. Superior Court*, 113 Ariz. 22, 29, 545 P.2d 946, 953 (1976), approved the admission of reputation evidence when the defendant has alleged that the complainant actually consented to an act of prostitution. Aside from the fact that we merely cited *Pope* without expressing our approval of it, this argument fails for two reasons.

First, the defense in this case proffered only evidence of Jones' general reputation as a prostitute or of specific acts of prostitution with others, not proof that she consented to an act of prostitution *with Brewer* that night in his apartment. Second, even the Arizona courts, following *Pope*, require that evidence of prostitution be demonstrably more probative than prejudicial, a showing which the defense did not make here. *See State v. Quinn, supra*, 121 Ariz. at 585, 592 P.2d at 781.

To the extent that this line of questioning opened the door to cross-examination, the record makes clear that Brewer was allowed to walk through it. The direct covered only Abdullah's relationship with Jones and Abdullah's knowledge, if any, that Jones had previously consented to an act of prostitution with Brewer. Extensive cross-examination of Abdullah was allowed on both of these subjects, but was properly prohibited on the subject of Jones' prior acts, character, or reputation in general, which had not been addressed on direct. Any cross-examination of Abdullah on these subjects, aside from being substantively inadmissible, was beyond the scope of direct and within the trial court's discretion to proscribe. *See Mitchell v. United States,* 408 A.2d 1213, 1214 (D.C.1979); *Springer v. United States,* 388 A.2d 846, 854–855 (D.C.1978). Further, any inquiry into whether Jones was a prostitute, other than into whether she consented to act as a prostitute with Brewer that night, would have been prejudicial precisely because it would have "divert[ed] the jury's attention to collateral matters...." *McLean, supra,* 377 A.2d at 77.

### III

Brewer also contends that the prosecutor in closing argument improperly commented on his decision to refrain from testifying on his own behalf, in violation of his Fifth Amendment rights. *See Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Bowler v. United States,* 480 A.2d 678, 682–684 (D.C.1984). The standard by which we assess the prosecutor's argument is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be comment on the failure to testify." *Byrd v. United States,* 364 A.2d 1215, 1218 (D.C. 1976) (citations omitted); *accord, e.g., Bowler v. United States, supra,* 480 A.2d at 683; *see also Boyd v. United States,* 473 A.2d 828, 833 (D.C.1984) (to obtain reversal, "it must be established that no one other than the defendant (who chose to remain silent) could have contradicted the government's evidence"). The record does not suggest—and Brewer does not argue—that the prosecutor's remarks were "manifestly intended" as a comment on Brewer's failure to testify. We therefore must determine only whether reasonable jurors would have "naturally and necessarily" understood the prosecutor's remarks to be comments on Brewer's failure to testify. While there was one remark that should have been left unsaid, we hold that it does not rise to the level of prejudice that, under *Byrd* and other cases, would require reversal.

■ Mary Jones testified that just before Brewer raped her, he said he was "going to make me pay my dues." In discussing this testimony, the prosecutor said, "What does that mean? There was no other explanation given." Brewer now contends that this statement was an impermissible comment on his failure to take the witness stand. Reading the statement in context, however, we are satisfied that the prosecutor was focusing on Jones' testimony, reminding the jury that *she* had not explained why Brewer made the statements. It was Jones, not Brewer, who provided the evidence of what Brewer said, so that the prosecutor's comment on the meaning of that evidence did not naturally and necessarily refer to Brewer's lack of explanation at trial. Rather, the prosecutor referred to Jones' lack of explanation and invited the jury to draw its own inferences from the evidence.

■ Closer to the borderline of impropriety, however, is a statement that the prosecutor made when he was discussing Brewer's possible motive for committing the rape:

Why did he do it? *Nobody who took the witness stand can tell you why he did it.* But they told you that he did it. Why he did it is not at all important to this trial.

If you decide beyond a reasonable doubt that he did it, that is it.

Although it is a fairly close call, we are guided in our assessment of the italicized sentence by the principle announced by the Supreme Court in *Donnelly v. De Christoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974):

[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*See Arnold v. United States*, 511 A.2d 399, 413 (D.C.1986). There is enough ambiguity in the prosecutor's statement to satisfy us that it did not "naturally and necessarily" point to Brewer and to the fact that he exercised his Fifth Amendment right not to testify. Actually, the statement on its face refers to the witnesses who testified, pointing out that "they" (those who took the witness stand) "told you that he did it" and commenting that "why he did it is not … important…." It is at least reasonable to infer that the prosecutor was referring to his own witnesses ("they"), not to Brewer. This statement simply cannot be compared to the impermissible reference to the defendant condemned in *Griffin v. California*, *supra*, 380 U.S. at 611, 85 S.Ct. at 1231, in which the references to the defendant's silence were explicit.[9]

■ Even if improper, the statement was only one short sentence in a lengthy closing argument made at the close of four days of trial. We also note that Brewer was acquitted of one of the crimes with which he was charged, and was found guilty of a lesser included offense with respect to another charge.[10] Accordingly,

**9.** *White v. United States*, 248 A.2d 825 (D.C. 1969), cited by appellant, is distinguishable for the same reason.

**10.** See notes 1 and 4, *supra.*

**11.** We note also that the prosecutor was challenging defense counsel's failure to prove what he said the defense would prove in his opening statement. This is permissible; the prosecutor was entitled to point out that the defense did not live up to its promises. *See Tillman v. United States*, 487 A.2d 1152, 1154 (D.C.1985); *Boyd v. United States, supra*, 473 A.2d at 833–834 (prosecutor permitted to respond, using "no evidence" arguments, to defense counsel's unproven hypotheticals).

**12.** Brewer contends that the prosecutor in his summation mischaracterized the evidence regarding Jones' reasons for reporting the rape, the medical testimony about the lack of visible

even if the statement was improper, we hold that it was harmless beyond a reasonable doubt because there is no reasonable possibility that it contributed to Brewer's convictions. *Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967); *see Bowler v. United States, supra*, 480 A.2d at 684 (citing *Chapman* and noting that statements more suggestive than those here did not, absent other prejudicial error, warrant reversal).[11]

■ Brewer's remaining assignments of error are baseless.[12] His convictions are therefore

*Affirmed.*

injury to Jones' vagina, and the testimony of Dr. Duncan concerning Jones' demeanor. These contentions are meritless. Each remark of which Brewer complains was a reasonable comment on the evidence or a reasonable inference from the evidence, permissible under *Tuckson v. United States*, 364 A.2d 138, 142 (D.C.1976). Brewer also contends that the prosecutor improperly urged the jurors to "stand in the shoes" of the victim, a type of argument which we condemned in *Hawthorne v. United States*, 476 A.2d 164 (D.C.1984). We cannot agree. Although there was, as the government states in its brief, "an emotional content to the prosecutor's remarks," they were sufficiently supported by the evidence, specifically the victim's own testimony, to withstand challenge here. *Hawthorne* was an extreme case, not at all comparable to the case at bar.