Hillsborough-northern judicial district
No. 2000-234

THE STATE OF NEW HAMPSHIRE

v.

JACK Z. HIGGINS

Argued: November 14, 2002
Opinion Issued: April 7, 2003

*Philip T. McLaughlin*, attorney general (*Susan P. McGinnis*, attorney, on the brief and orally), for the State.

*Richard E. Samdperil*, public defender, of Stratham, by brief and orally, for the defendant.

*Jack Z. Higgins*, by brief, *pro se*.

BRODERICK, J. The defendant, Jack Z. Higgins, appeals his convictions for aggravated felonious sexual assault, *see* RSA 632-A:2 (1996) (amended 1997, 1998, 1999), criminal restraint, *see* RSA 633:2 (1996), and two counts of felony criminal threatening, *see* RSA 631:4 (1996 & Supp. 1996) (amended 2002). He argues that the Trial Court (*Groff*, J.) erred by: (1) ruling that he voluntarily waived his *Miranda* rights prior to making incriminating statements to the police; (2) precluding him from questioning the victim regarding her prior consensual sexual activity; (3) imposing enhanced sentences on his convictions for criminal threatening under RSA 651:2, II-g; and (4) subjecting him to consecutive, rather than concurrent, sentences on his convictions. We affirm.

I

The following facts were adduced at trial. In June 1998, the defendant was driving his truck in Manchester and met the victim, who was working as a prostitute. The two discussed exchanging sex for money and agreed upon a price of $65. The defendant took the victim to his third-floor apartment in Manchester. Once inside, the victim performed fellatio on the defendant and after some discussion, he informed her that he wanted to engage in intercourse. The victim told him that she hoped he was not into "freaky sex" because she was not. He replied that he did like "freaky" sex and told her that he wanted to engage in "doggie-style" intercourse. She reluctantly agreed after he reminded her that he was paying her.

During intercourse, the defendant suddenly stopped. The victim turned to look behind her and saw that he had a gun pointed to her head. He screamed at her, "You're in trouble now, bitch. What are you going to do? Do you realize how much trouble you are in?" The victim became hysterical and curled up in a corner of the bed.

For approximately two hours, the defendant viciously attacked and terrorized the victim. He handcuffed her hands behind her back, shackled her ankles, wrapped her in a sheet and blanket using packing tape to secure them around her neck, wrists and ankles, tied her wrists and ankles with rope, dragged her by her hair and by the ankle shackles, slammed her head into a wall, head-butted her in the face, beat her with a riding crop, attempted to force her to swallow a condom, gagged her with a sock,

suffocated her with a pillow, and sat on her face with his bare buttocks. Throughout the attack, the defendant screamed profanities at her, saying that he hated women and that "it was all [her] fault." At one point, the victim tried to break through a window when the defendant left the room. He returned and put a gun in her mouth, asking her if he should "put [her] to sleep and get it over with now."

Towards the end of the attack, the defendant sodomized the victim, then turned on a light and said, "What have I done to you?" He eventually removed all the restraints and told her she had a few minutes to get dressed to go with him. They went to his truck and after driving for several miles, he told her that he was going to Boston and she could jump out whenever she wanted. She got out at a stop sign.

The following morning, the victim reported the attack to the police. She was treated for her injuries at a hospital and completed a rape kit. On June 28, the police arrested the defendant. He was transported to the Milford Police Department and interviewed. He initially gave several inconsistent stories but finally incriminated himself.

The defendant was convicted on one count of aggravated felonious sexual assault for sodomy, one count of criminal restraint and two counts of felony criminal threatening. At trial, the defendant advanced consent as a theory of defense, testifying that the victim allowed him to use the shackles, handcuffs, rope, riding crop, and willingly engaged in anal intercourse. He denied, however, that he wrapped and taped the victim in a sheet and blanket, pointed a gun at her, suffocated or gagged her, or committed any other physical assaults. The jury found him guilty on all four counts, and the court ordered him to serve four consecutive sentences, totaling 33 ½ to 67 years in the New Hampshire State Prison. This appealed followed.

## II

The defendant argues that the trial court violated his right against self incrimination under Part I, Article 15 of the State Constitution when it ruled that he voluntarily waived his *Miranda* rights before making statements to the police about the events of June 26. *See State v. Gagnon*, 139 N.H. 175, 177 (1994); *Miranda v. Arizona*, 384 U.S. 436 (1966). While he does not dispute that he understood his rights and waived them, he argues that the police did not inform him of his constitutional rights until after the interrogation concluded. He contends that the trial court's ruling to the contrary was against the manifest weight of the evidence. We assume without deciding that the defendant's argument was properly preserved for appellate review, and conclude that the trial court committed no error.

The sole issue is the timing of the *Miranda* warnings; that is, whether the police advised the defendant of his constitutional rights before or after the substantive interrogation. Because the trial court faced conflicting testimony on this issue and it "was in the best position to weigh the credibility of the witnesses, we will not reverse its finding [in favor of the State] unless the manifest weight of the evidence, when viewed in the light most favorable to the State, is to the contrary." *State v. Plante*, 133 N.H. 384, 387 (1990).

According to the interrogating officers, Detectives Stacey Howe and James Soucy, they began their interview with the defendant around 8:15 p.m., after his arrest. After spending approximately ten to fifteen minutes gathering background information from him, they advised him of his *Miranda* rights. The detectives testified that after they verbally reviewed a standard *Miranda* form, the defendant recited his rights, indicated that he understood them and signed the form. At that point, they began questioning him about his encounter with the victim and eventually obtained a version of events that essentially mirrored the victim's recollection. This chronology was corroborated by the time recorded on the *Miranda* form of 8:28 p.m.

The defendant testified, however, that at the conclusion of his interrogation, the officers reviewed and completed the *Miranda* form in conjunction with a consent to search form. He contends that the trial court should have completely discredited the officers' version of events due to a discrepancy in the State's evidence regarding the time the search form was completed. Specifically, the time recorded on the search form of 8:58 p.m., one-half hour after the time recorded on the *Miranda* form, contradicts Detective Howe's testimony and the chronology in the police report, which support the defendant's recollection that the search form was completed at the conclusion of the interrogation at approximately 10:30 p.m. The defendant asserts that absent a specific finding that he lacked credibility, the trial court should have disregarded the officers' testimony and ruled his statements to the police inadmissible. We disagree.

Howe acknowledged the mistake between the time recorded on the search form and the chronology provided in the police report. He explained that there is no standard procedure on presenting a search form during the course of an interview. He remained certain, however, as to when they reviewed the *Miranda* warnings with the defendant because he had been trained by the department to follow the same procedure for all interviews: first, gather background information; next, review *Miranda* rights; and, finally, question the detainee about the alleged crime.

Soucy's recall on the chronology of *Miranda* also was definite. While he could not remember when the search form was completed and signed by the defendant, he suggested that the defendant may have filled it out when discussion of the gun first arose and perhaps signed it once the interview ended. Moreover, Soucy's and Howe's recollection that they reviewed the defendant's *Miranda* warnings with him before questioning him about his involvement with the victim was corroborated by a third police officer who witnessed the initial portion of the interview from an adjoining room.

█ We conclude that the evidence before the trial court was sufficient to support its factual finding that the defendant was given his *Miranda* warnings before substantive interrogation began. The trial court expressly found the officers' testimony credible, and thus necessarily discredited the defendant's testimony. Accordingly, the defendant failed to show that the trial court's finding is against the manifest weight of the evidence.

## III

The defendant next argues that the trial court erred when it precluded him from questioning the victim about her past consensual sexual activity as a prostitute. Specifically, he sought to inquire whether she previously had consented to acts of bondage, sadomasochism or sodomy in exchange for drugs or money. He contends that this line of inquiry was relevant to his defense theory that the victim consented to being restrained and to engaging in anal intercourse with him because she was previously willing to engage in acts she otherwise found objectionable in order to gain money to support her drug habit.

█ Generally, under the rape shield law, evidence of prior consensual sexual activity with persons other than the defendant is inadmissible. *See* RSA 632-A:6, II (1996); N.H. R. Ev. 412. The purpose of this law is "to spare the rape victim . . . from unnecessary embarrassment, prejudice, and harassment." *State v. Dean*, 129 N.H. 744, 748 (1987). In certain instances, however, protection of a prosecutrix and her privacy rights must yield to a defendant's rights to due process and to confront accusers. Thus, a defendant facing charges under RSA chapter 632-A must have the opportunity to demonstrate that evidence of a victim's prior consensual sexual activity is relevant and that its probative value outweighs its prejudicial effect on the victim. *See State v. Spaulding*, 147 N.H. 583, 589 (2002).

In the defendant's pretrial motion, he sought to ask the victim about any past prostitution involving consensual acts of bondage, sadomasochism or sodomy. While he was unaware of any particular prior sexual activity of this nature, he wanted to explore this subject area during a then-upcoming

deposition with the victim. The trial court denied the motion, ruling that: (1) the purpose of the rape shield law applied to the victim in this case; (2) whether the victim had engaged in such activities was pure speculation; (3) the evidence sought had no relevance to the case; and (4) any probative value of the evidence was far outweighed by the prejudice it would cause to the victim. It thus determined that due process did not require that the defendant be allowed to delve into the victim's past sexual conduct.

"In order to question a prosecutrix about specific instances of prior sexual activity during a deposition, the defendant must show that there is a *reasonable possibility* that the information sought will produce the type of evidence that due process will require to be admitted at trial." *State v. Ellsworth*, 136 N.H. 115, 117 (1992) (quotation, brackets and ellipsis omitted). The trial court retains the discretionary authority to rule on pretrial discovery matters, even where a defendant's constitutional rights are implicated, *see id.*; *Spaulding*, 147 N.H. at 589, and thus we review the trial court's pretrial discovery ruling for an unsustainable exercise of discretion, *see Ellsworth*, 136 N.H. at 117; *State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). To achieve reversal, the defendant "must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case," *Lambert*, 147 N.H. at 296 (quotation omitted), and that any error is prejudicial to his substantive rights, *Ellsworth*, 136 N.H. at 117. We first address the defendant's argument under our State Constitution. *State v. Ball*, 124 N.H. 226, 231 (1983). Because the Federal Constitution provides no greater protection in this area, we need not undertake a separate federal analysis. *See State v. Glodgett*, 148 N.H. 577, 580 (2002) (right to confrontation under Federal Constitution provides no greater protection than under the State Constitution where defendant sought to cross-examine victim on past sexual relationship); *cf. Brown v. Powell*, 975 F.2d 1, 3-4 (1st Cir. 1992).

We turn initially to the defendant's argument that his proposed line of inquiry would not have offended the purpose of the rape shield law. According to the defendant, the purpose of preventing a jury from improperly judging credibility based upon promiscuity was simply inapplicable in this case, presumably because the State intended to show that the victim engaged in prostitution to support her drug addiction, and he sought only "to establish to what extent [the victim] would go to feed her [drug] habit."

The defendant fails to address the full scope of the purpose of the rape shield doctrine. Certainly, the doctrine dispels the "old concept of equating a woman's promiscuity with lack of credibility." *State v. Howard*,

121 N.H. 53, 60 (1981). It also, however, protects a prosecutrix "from questions not within the proper bounds of cross-examination and which are designed only to harass, annoy or humiliate." *Id.* at 59. "No woman wishes to expose her private life to unnecessary public probing." *Harris v. State*, 362 S.E.2d 211, 213 (Ga. 1987). Indeed, we have previously held that the rape shield law "makes no distinction among categories of victims," *State v. Besk*, 138 N.H. 412, 414 (1994), and thus it provides no less protection for prostitutes even though their sexual conduct is exchanged for money or other remuneration.

While the State intended to reveal to the jury the victim's promiscuous occupation and thus make known generally that she had consented to sexual activity on prior occasions, *see Brewer v. United States*, 559 A.2d 317, 321 (D.C. 1989), *cert. denied*, 493 U.S. 1092 (1990), questioning her about specific acts or types of sexual conduct would have exposed her to further and more exacting embarrassment. Accordingly, we reject the defendant's argument that his proposed line of inquiry would not have offended the purpose of the rape shield doctrine.

Next, we conclude that even assuming the defendant offered sufficient evidence to justify inquiring during the victim's deposition about past acts of prostitution, the defendant failed to satisfy his burden of establishing "a *reasonable possibility* that the information sought [would] produce the type of evidence that due process [would] require to be admitted at trial." *Ellsworth*, 136 N.H. at 117 (quotation omitted). To be admissible at trial, evidence must be relevant; that is, it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401; *see State v. Walsh*, 139 N.H. 435, 436 (1995). We find no merit to the defendant's contention that prior acts of anal intercourse, bondage and sadomasochism in the course of the victim's prostitution would have made it more probable that she allowed him to restrain her with handcuffs, shackles and rope and consented to anal intercourse.

Consent to sexual conduct with one person in no way implies consent to such activity with another. *Commonwealth v. Joyce*, 415 N.E.2d 181, 185 (Mass. 1981); *State v. Patnaude*, 438 A.2d 402, 410 (Vt. 1981). "Each decision to consent is a new act, a choice made on the circumstances prevailing in the present, not governed by the past." *Patnaude*, 438 A.2d at 410. Whether a woman previously engaged in a particular type of sexual activity, such as anal intercourse or sadomasochistic role-play, with another person has no bearing, in and of itself, on whether she agreed to

do so with the defendant. *People v. Sandoval*, 552 N.E.2d 726, 733 (Ill.), *cert. denied*, 498 U.S. 938 (1990).

Further, the victim's status as a prostitute does not necessarily mean that she will accept every opportunity that comes along to engage in sexual relations or relent to the desires of any paying customer, regardless of her motivation for engaging in prostitution in the first instance. *See Harris*, 362 S.E.2d at 213; *Patnaude*, 438 A.2d at 407. "A prostitute does not lose the right of choice, and may consent or not consent according to her own will." *Brewer*, 559 A.2d at 321 (quotation omitted); *see Patnaude*, 438 A.2d at 407.

■We recognize that circumstances may arise which may make a prostitute's past consensual sexual activity relevant to her bias, prejudice or motive to fabricate. *See State v. Cannon*, 146 N.H. 562, 565 (2001); *Commonwealth v. Houston*, 722 N.E.2d 942, 945 (Mass. 2000); *Joyce*, 415 N.E.2d at 186. In this case, the defendant argues only that the evidence sought would have been offered to show her propensity to engage in sodomy, bondage and sadomasochism and thus, make it more probable that she would have consented to engage in such conduct with him, a position we reject under the circumstances of this case. Accordingly, we conclude that the defendant failed to establish that his proposed line of inquiry during the deposition process could have led to any relevant information which would have aided the jury in ascertaining any specific fact contested.

Even assuming, for the sake of argument, that the victim's sexual proclivities bore some relevance on the issue of consent, we conclude that the defendant failed to show that the probative value of such evidence outweighed its prejudicial impact. *See Spaulding*, 147 N.H. at 589. Reasonable members of our society differ greatly in their judgments about the propriety of different types of sexual conduct. *Patnaude*, 438 A.2d at 408. Thus, introducing evidence of a victim's past sexual conduct presents great danger of offending and inflaming those jurors who may find such conduct alien to their own experience and contrary to their morals. *Id.* Especially where the prior conduct involves consent to deviant activity, offended jurors may be unable to comprehend how such a person could be raped. *See id.*

While the jury in this case was aware of the victim's prostitution, delving into past sexual activity would have raised a particular danger of inflaming jurors' "sensibilities" in this case given the focus on sexual deviancy. The proper role of the jury is to render an impartial, fact-based decision about whether the sexual contact between the prosecutrix and the defendant was forced or consensual. *See Sandoval*, 552 N.E.2d at 734. In this case, we

conclude that the line of questioning proposed by the defendant was not only irrelevant, but created undue risk of improperly diverting the jury's attention to matters of a prurient nature and potentially affronting those who disagree with the propriety of that type of sexual activity.

Finally, the defendant argues that asking the victim whether as a prostitute she had previously consented to acts of sodomy, bondage or sadomasochism became necessary at trial to "refute the impression created by [her] testimony that she would never consent to such acts." He sought only to ask the victim during cross-examination *whether* she had previously consented to that type of conduct as a prostitute, and did not wish to introduce extrinsic evidence of, or confront her with, any past sexual conduct. We conclude that the defendant effectively accomplished his proposed line of inquiry during his colloquy with the victim.

On cross-examination, defense counsel asked the victim, "Where is the line" of acceptable sexual activity in which she would refuse to engage with a customer. She responded, "Anal sex, bondage, that's the line." Counsel also questioned her about her meaning of "freaky sex," referring to her comment to the defendant that she was not "into freaky sex." She explained, "having pillows being put over my face and guns being put into my mouth, those kind of things," as well as "bondage . . . [h]andcuffs, . . . [w]hips, [and] ropes." The defendant points to no area in the trial record in which he requested delving further into the victim's past conduct, and the trial court precluded him from doing so. Accordingly, we conclude that the defendant failed to establish that the trial court limited his ability to question the victim about her past prostitution.

IV

The defendant next argues that the trial court violated his rights under Part I, Article 15 of the State Constitution and the Fifth Amendment of the Federal Constitution when it imposed enhanced sentences for his two criminal threatening convictions. In particular, he contends that the court failed to ensure through its instructions to the jury a unanimous finding that he used a firearm as a deadly weapon in the commission of the criminal threatening offenses, the basis of the sentence enhancement.

At trial, the defendant faced two counts of felony criminal threatening. *See* RSA 631:4. One indictment charged "physical conduct" criminal threatening, *see* RSA 631:4, I(a), alleging that "he, by physical conduct, purposely placed [the victim] in fear of imminent bodily injury by brandishing a firearm, a deadly weapon, at her head while saying 'you're in big trouble now' or words to that effect." The other indictment charged "terrorizing" criminal threatening, *see* RSA 631:4, I(c), alleging that "with

the purpose to terrorize [the victim], he threatened to commit the offense of homicide by placing the barrel of a firearm, a deadly weapon, in her mouth and stating 'I'm going to put you to sleep.'" Both indictments charged a felony due to his use of a deadly weapon. *See* RSA 631:4, II. After the jury found him guilty on both counts, the judge imposed enhanced sentences under RSA 651:2, II-g, which permits a maximum twenty-year prison term when an element of the felony includes possession, use or attempted use of a firearm as a deadly weapon. *See* RSA 651:2, II-g (Supp. 1996).

The defendant relies upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to assert that he was improperly subjected to enhanced sentences. Under *Apprendi*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proven beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Although *Apprendi* was not decided until after the defendant's sentencing, the State agrees that in this case, he is entitled to the protection afforded by its mandates. Accordingly, we will assume, without deciding, that for the enhanced penalties to stand, the jury must have found unanimously that the defendant used a firearm as a deadly weapon in the commission of both criminal threatening offenses. *See id.*

Further, we need not address the defendant's contention that the State Constitution affords similar safeguards as prescribed by the Federal Constitution under *Apprendi* because he does not assert that it provides greater protection than its federal counterpart. We turn, therefore, to the jury instructions to evaluate them "in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case," *State v. Bonacorsi*, 139 N.H. 28, 30 (1994) (quotation omitted), and discern whether the unanimity requirement of *Apprendi* was satisfied in this case.

During the jury instructions, the trial court recited the criminal threatening charges in the indictments, including the defendant's alleged use of a firearm as a deadly weapon. It also defined for the jury the legal elements of the offenses, but neglected to provide the felony element of use of a deadly weapon. *See* RSA 631:4, II. Consequently, it provided the following supplemental instruction:

> Ladies and gentlemen, as to the definition of the crimes of criminal threatening, I left out one very important element of the offense. So, to each crime of criminal threatening I told you in one instance that there were three — the first instance where he brandished a firearm at her head I indicated that there were three parts of the definition: 1, that the defendant acted purposely; and 2, that the defendant placed [the victim] in fear of

imminent bodily injury; and 3, that he did so by means of some physical conduct. The second one I told you had two parts and that involved the allegation that the defendant placed the barrel of a firearm in [the victim's] mouth and I told you that the two elements were: 1, that the defendant threatened to commit the crime of homicide against [the victim]; and 2, that the defendant did so with the purpose to terrorize her.

Now, in each one of these definitions there is an additional element, so in the first one it would be a fourth part and in the second one it would be a third part. This part is, and it has to be proven by the State beyond a reasonable doubt, that the defendant used a deadly weapon in the violation — in committing this crime.

I'm going to define deadly weapon for you. A deadly weapon means any firearm, knife, or other substance or thing which in the manner it is used, intended to be used, or threatened to be used is known to be capable of producing death or serious bodily injury.

The defendant asserts that the jury instructions failed to require the jury to unanimously find that he used a firearm, as opposed to some other deadly weapon, to commit the charged criminal threatening offenses. He assigns particular error to the court's broad definition of "deadly weapon" as "any . . . substance or thing, [including a firearm], which in the manner it is used, intended to be used, or threatened to be used is known to be capable of producing death or serious bodily injury." While felony criminal threatening requires use of any deadly weapon as defined under RSA 625:11, V, *see* RSA 631:4, II, the sentence enhancement statute specifically requires use of a firearm as a deadly weapon, *see* RSA 651:2, II-g. Because the deadly weapon jury instruction did not limit "deadly weapon" to a firearm and because the evidence showed that the defendant used a variety of objects during the attack (including a riding crop, handcuffs, shackles and blankets), the defendant argues that the jury could have rendered a verdict on the deadly weapon element of the criminal threatening charges without unanimously agreeing that a firearm, rather than the other objects, constituted the deadly weapon. This position lacks merit.

The indictments isolated particular moments during the approximately two-hour attack on the victim in which the defendant used a firearm to threaten her. Specifically, the "physical conduct" indictment charged that he brandished a firearm at the victim's head while saying "you're in big trouble now" or words to that effect. The victim's testimony shows that

this event occurred before he produced any restraints, wrapped her in blankets, hit her with the riding crop, or used any other object to hurt her. As well, the "terrorizing" indictment alleged that he threatened homicide by placing the barrel of a firearm in the victim's mouth and saying, "I'm going to put you to sleep." While the victim was restrained by handcuffs and shackles at this point, her testimony shows that he was using the restraints to restrict her ability to escape, not to threaten homicide in the manner charged in the indictment.

On three occasions, the court relayed to the jury the criminal threatening allegations, including the use of a firearm as a deadly weapon, once at the beginning of the trial and twice during the jury instructions. Indeed, the supplemental instruction itself reiterated the defendant's use of a firearm. Further, the State did not stray from the charges in the indictments in its opening and closing arguments and argued only that the defendant used a firearm to commit both criminal threatening offenses.

In light of the jury instructions as a whole and the evidence presented at trial, we conclude that a reasonable jury would understand that the "deadly weapon" element of both criminal threatening charges exclusively referred to the use of a firearm. Therefore, the guilty verdicts reflect a unanimous conclusion that the defendant used a firearm, and no other object, as a deadly weapon to commit the crimes. Accordingly, we conclude that the constitutional mandate of unanimity under *Apprendi* was fully satisfied in this case.

## V

The defendant, in his *pro se* brief, challenges the consecutive nature of his sentences on numerous grounds. He argues the unconstitutionality of RSA 651:3, III, a former provision that defined the types of criminals subject to consecutive sentencing. He also contends that imposing consecutive rather than concurrent sentences for his four convictions violates *Apprendi*, subjects him to double jeopardy under the State and Federal Constitutions, violates the doctrine of merger, and constitutes prosecutorial harassment.

We do not address the defendant's arguments under RSA 651:3, III because that provision was repealed in 1975, and the defendant does not suggest, nor does the record indicate, that the trial court relied upon that provision in any way when it imposed consecutive sentences. Further, aside from his *Apprendi* argument, we decline to address his remaining arguments because they either are cursory in nature, *State v. Blackmer*, 149 N.H. 47, 49 (2003), or are wholly lacking in merit, *Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

■ Finally, we reject the defendant's contention that his consecutive sentences violate *Apprendi*. The United States Supreme Court in *Apprendi* addressed a circumstance in which the statutory maximum for a particular count was enhanced by a fact not determined by the jury. *Apprendi*, 530 U.S. at 470-71, 483-84. *Apprendi* poses no bar to the imposition of consecutive sentences for multiple convictions when the sentence for each conviction does not exceed the statutory maximum for that conviction. *See, e.g., United States v. McLeod*, 251 F.3d 78, 82 (2d Cir.), *cert. denied*, 534 U.S. 935 (2001); *United States v. McWaine*, 290 F.3d 269, 276 (5th Cir.), *cert. denied*, 123 S. Ct. 311 (2002). This is true "even when the total punishment exceeds the highest statutory maximum on any particular count." *McWaine*, 290 F.3d at 276. Because we have already addressed the propriety of the sentence enhancement for the criminal threatening convictions and the defendant does not assert that the sentences for the remaining counts exceeded the statutory maximum for each count, he failed to demonstrate that the consecutive sentencing in this case resulted in punishment greater than that authorized by the jury verdict. *See United States v. White*, 240 F.3d 127, 135 (2d Cir. 2001). Therefore, the defendant's challenge under *Apprendi* fails.

The issues raised in the notice of appeal but not briefed are deemed waived. *State v. Berry*, 148 N.H. 88, 93 (2002).

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.